Mr. Ryan. Now Mr. Ryan. Thank you, Your Honor. May it please the Court. The trial court's decision should be reversed for at least three reasons. First, contrary to the trial court's holding, TFC did not contribute $126 million to this transaction. The assistance agreement is clear. Section 5 of the assistance agreement sets out the party's contribution obligations. It mentions a $107.5 million obligation on the part of FSLE. It doesn't mention any obligation on the part of TFC, or TransOhio for that matter. The only language that TFC points to in the assistance agreement is Section 2A1B, which simply requires TFC to provide a letter from their counsel saying that the mergers have been duly authorized. No one has ever explained how that provision of a letter from counsel can constitute a $126 million contribution provision. Certainly TFC didn't think so because TFC said in a securities filing on the day the no consideration was paid by registrant, which was TFC, or TransOhio in connection with these acquisitions. That should settle the matter. There is simply no contractual or any other contribution requirement on the part of TFC. According to the trial court, TFC irrevocably contributed its TransOhio assets, quote, to a very risky venture, and it goes on to state that essentially it obligated exactly that amount. That's incorrect for a couple of reasons, Your Honor. First of all, TFC's assets in TransOhio constituted TFC's stock in TransOhio. TFC owned that stock the day before the transaction, it owned that stock the day after the transaction. So it didn't contribute the only assets it had. That's what distinguishes this case from Hansen, where the Hansens actually did contribute their stock. Secondly, with regard to the matter of whether this was a very risky transaction, TFC's stock we presented evidence, and it was undisputed, TFC's stock actually went up the day after the transaction, or the few days after the transaction. So what does that mean? That means that the market certainly didn't think this was a very risky transaction. In fact, TFC could have sold its stock. What difference does it make whether it was risky or not? It doesn't make any difference whether it was risky. I was just responding to the question the trial court had held that TFC irrevocably contributed its assets in TransOhio to a very risky transaction. Neither part of that sentence is correct, even if it did matter. But it did contribute its stock, ownership. It caused its subsidiary to essentially merge with two S&Ls. It didn't really cause its subsidiary. Its subsidiary, TransOhio, applied to the Federal Home Loan Bank Board in October 1985 to merge. TFC, as the owner, was not a part of that application. As a matter of law, TFC did, as a holding company, have to file a subsequent holding company application to the Federal Home Loan Bank Board. But it did not obligate itself to have the transaction. What was its obligation under the assistance agreement? TFC's obligations under the assistance agreement are in Section 14. Essentially, its obligations were to maintain the net worth of TransOhio if TransOhio's net worth fell below a certain level. It didn't have to... But also regulatory capital requirement. That's correct. The net worth... Well, regulatory capital was defined as net worth before FIREA. And TFC had to authorize the merger, too, right? As a matter of the contract, yes. FSLIC required TFC to authorize the merger. As a shareholder. As a shareholder. But that doesn't mean TFC contributed $126 million. One can look at it this way. If the transactions were structured a little bit differently, if citizens had been acquired on one day and dollar the next day, under TFC's and the FDIC's theory, TFC and TransOhio would have contributed $126 million one day and would have contributed $126 million the next day. That's simply wrong as a matter of economics. The price that a purchaser pays for something depends on what that something it's purchasing is worth. It has nothing to do with the existing value of the purchaser. So for all of these reasons, this case, and the only case from this court that TFC relies on is Hansen. And again, in Hansen, the court emphasized over and over that what was being contributed in Hansen was actual stock. That did not occur here. The quotes from the Hansen case make this clear. Thus, the fundamental requirements for restitution are present in the stock exchange. The Raritan stock was contributed. We didn't have any contribution of stock here by either TransOhio or by TFC. So what we have is a situation here in which the holding company was a party to the contract, right? Yes. But you say that the stock doesn't represent a reliance expenditure under the contract. That's correct, because it could, under some contract, represent a reliance expenditure, but it just was not obligated to contribute any stock, any assets under the contract. That doesn't mean it didn't have any obligations under the contract. It was obligated to maintain the net worth of TransOhio. However, if the net worth fell below a certain level, it was never called upon to make good on that contractual obligation. In simple terms, you have two failed thrifts with a negative worth of $130 million. TFC obligates practically the exact same amount out of its subsidiary. Where's the problem here? Somebody is picking up $130 million, and it's all underwritten and authorized and taken as a central action by TFC. Help me out here. Somebody is picking up the $130 million, and the primary party that's picking up the $130 million is the FISLIC. The FISLIC contributed $107.5 million, substantially filling the hole. So there was not a $130 million hole that TransOhio was facing. And that was in regulatory capital, right? That was in cash, and that cash could be counted towards regulatory capital. So TFC and, well, mainly TransOhio got two things. It got the $107.5 million in cash, and it got the right not to have to reduce goodwill by that amount. So that effectively provided it an additional $107.5 million in regulatory capital, too. But the FISLIC wasn't just contributing regulatory capital. It was contributing hard cash to close that hole. So there is simply no evidence that any party other than FISLIC actually made a cash, stock, or asset contribution to this transaction. The other aspect of the trial court's summary judgment decision with regard to the $42 million post-acquisition infusion, the court also erred as a matter of law on that. And that judgment should, that aspect of the trial court's decision should be reversed. The $42 million, according to the trial court's own decision, was intended to be infused as early as 1985. And why does that mean that they didn't make the $42 million contribution in reliance on the forbearances? Because they have not presented any evidence that they would have, they would not have made that contribution in the absence of the contracts. And the evidence is clear on that because Mr. Burstein, TFC's CEO, sent a letter to the regulators in June 1985 saying, we want the rights agreement, TFC's rights agreement, which was the mechanism through which it was going to raise the money to infuse into Trans-Ohio. We want that closed before the citizens and dollar transaction closed. So as a matter of simple logic, they wanted that money infused before the citizens and dollar transaction was closed. But it was contemplated at the time, wasn't it? The thrift acquisitions of citizens and dollar. Yes, they were contemplated at the time. But Mr. Burstein, whose affidavit that the plaintiffs rely on here, says it had nothing to do with the citizens and dollar acquisition. This is at page A41304 of the appendix. Plaintiffs intended that the purpose of the additional infusion of capital would be to support future growth of Trans-Ohio, et cetera. This capital infusion was not intended or designed to support Trans-Ohio's acquisition of citizens and dollar. So it could have been the case that they infused the money in reliance on the contract. But under this clear language, they didn't. This had nothing to do with it. I'm having trouble. I don't understand the inconsistency that you're claiming exists there. They're saying we did this to support additional acquisitions, but they could still be relying on the forbearances as an ingredient in their willingness to do it. They could be, but they didn't present any evidence whatsoever that remotely suggests that they were relying on the forbearance. The only thing they say is, we wouldn't have done it if we had known there would be a breach of contract. That's not the correct question for reliance damages. The question is, were you actually infusing this money in reliance on the contract? And there's no evidence of that. In fact, as I've related, the evidence is exactly the opposite. That in the absence of the contract, they would have infused this money anyways. And so therefore, at the very least, the court erred in resolving a material dispute of fact on summary judgment. And before I get into my rebuttal time, I just want to mention that the court need not reach the issue of causation. Because TFC has not shown that it contributed either $126 million or $42 million to the transaction. However, the trial court simply ignored this court's repeated holding that a breach does not automatically entitle a plaintiff to recover its reliance damages. The plaintiff must show that the breach caused it some loss with respect to that reliance damages. The court clearly held that was not the case. It relieved TFC of that burden of proof. And so if the court even reaches that issue, it should reverse on that ground as well. Thank you. Thank you, Mr. Ryan. The court will next hear for five minutes from Ms. Daugherty representing the FDIC, and then we'll hear from American Capital Corporation. Ms. Daugherty. Good morning, Your Honor. The FDIC is here this morning as the successor to the rights of the thrift in this case, and it is seeking an award not of the entire amount of damages awarded by the trial court to the holding companies, the shareholder plaintiffs, but only of the amount awarded for the contribution of the net equity of the corporation, which as our math shows in our brief, after you apply some offsets, nets out at 76 million. We do that because we're here to represent the creditors of the thrift. That includes the FDIC itself, but it doesn't only include the FDIC. This is one of those happy cases where an award of damages should allow us to pay third-party creditors as well. And those individuals would be the bondholders, and they would be the trade creditors. So that's who stands to lose if this award goes to the holding company. Is that in addition to any reliance damages that the TFC has obtained? I'm sorry, are you asking if we are seeking an additional amount of money? An additional 77 million, right. No. We are seeking the 76 million dollars that was awarded to TFC, and we are not seeking the 42 million. That has nothing to do with the FDIC. Your claim is that the claim belongs to the thrift and not to the holding company. That is correct. The government argued at some length that TFC, that the holding companies did not make a contribution. We agree with them, but we think that the thrift did make a contribution. And in addition to the facts that we cited in our brief in support of that proposition, I would like to point out a couple of other facts to the court. One is that if you look at the two proposals, it's the names, it's TransOhio that's on the names. It's the thrift that submitted the proposal to the regulators and asked for this transaction to be approved. If you look at the merger agreements, the merger agreements, both of them with both citizens and dollars, include a clause saying that the board of TransOhio has voted to approve this transaction, as it had to do. The approval of TFC could not make the deal go through. What the merger required was a vote by the board of TransOhio, the savings bank. And if you look at the actual forbearance letter, unlike some other forbearance letters we've seen in some other cases, the forbearance letter in this case is addressed to the thrift, to TransOhio. That's who was doing the deal here, and that's who made the contribution. Now, the question arises, of course, why didn't the trial court see it our way? And two reasons were given. One was that the shareholder plaintiffs put the thrift's value on the table. Well, I think both the FDIC and the government have demonstrated that that is not the case, that it was thrift that did that. But the second reason that was given was that the thrift didn't own any of its own stock. We were not told why this matters. So when you ask why this matters, the first question is, where do you go to see why this matters? Well, the assistance agreement says that it's governed by the law of the state of Ohio. And we had the recent decision of this court in the Southern California case, and there was actually a previous decision in West Bed which said, when the agreement has a choice of law provision, this court will enforce the choice of law provision. We look at the law of the state. In those two cases, I think it was California in both cases. Southern California. Yeah, and also in West Bed, I think it was California law. But in this case, our contracts, our merger agreements, I mean, our assistance agreement says, if federal law doesn't govern, we look to the law of the state of Ohio. Well, federal law, by definition, does not govern ordinary, everyday corporate law. So we look to the law of the state of Ohio. And we've explained at some length why the law of the state of Ohio would not allow the, you can call it piercing the corporate veil, you can call it reverse piercing the corporate veil, you can call it cheesecloth, I don't know, whatever you call it, under the law of Ohio, the corporate identities, there are no facts that would support looking outside the corporate identities of the thrift on the one hand, and the holding companies on the other. And there's an easy way to see, I think, that this is the right answer. Because all you have to do is pretend that we had an open thrift here. If we have an open thrift here, then this becomes a case like Glendale, and like some other cases that have come before the court, where the thrift itself receives the damages, and then the shareholders get whatever they get by virtue of being shareholders, the value of their stock goes up, or they get dividends, or whatever. But the shareholders don't get a damage award. Nothing changes just because the thrift has been seized. Thank you, Ms. Dougherty. Mr. Kirk, you have 15 minutes. Thank you, Judge Rader, and may it please the court. The government's argument that TFC is not entitled to recover the value of the thrift that it contributed to this transaction is- What do you mean contributed? All it did, it didn't contribute stock to any new entity. What it did was, in the words of the Court of Federal Claims, it permitted this merger to occur. And what strikes me is that this is different from any of the cases that we've had before. It's not like Hanson, it's not like others. And the question is whether when a holding company permits a merger to occur, pursuant to the contract, pursuant to its contractual obligations, whether that's the equivalent of contributing the equity in the subsidiary, right? That is the question, but your honor, that question has been answered in this court's cases. In West Fed, let me start with West Fed, then I'll turn to Hanson. In West Fed, this court had before it exactly the same structure. The holding company, West Fed Holdings, agreed with the government to permit its thrift, Old Western, to merge with the insolvent thrift, Bell. The contractual language that the court relied upon, it appears at page 1362 of 407F3rd, was that, and I'm quoting, the parties explicitly agreed in the assistance agreement that FISLIC obligations would be conditioned on the acquisition and merger of Bell, the insolvent thrift, with Old Western, the thrift that was owned by West Fed. That's exactly the same contract that we have in this case, your honor. Here, the government's obligations were expressly conditioned upon TFC's agreement to approve the merger of its thrift, Trans Ohio, with the two insolvent thrifts, Citizens and Dollar. Yeah, but the holding company here continued to hold the same stock in the same entity. That was also true, your honor, in West Fed. West Fed continued to own the merged entity after the merger. Now, there was one difference in West Fed that I want to put on the table, because it's one that perhaps my friend might bring up. In West Fed, the holding company bought the thrift, Old Western, for $148 million in order to enter the deal with the government. In our case, it's different. TFC already owned Trans Ohio. But I submit, your honor, that that difference cannot possibly be material. There is no principle of law or economics or fact that would justify holding that a holding company that contributes a thrift that it just bought can recover the value of that thrift. It bought it pursuant to the agreement. It was not pursuant to the agreement. In fact, the government pointed out in its arguments in West Fed that it had separately already agreed to buy the thrift. And this court said that that didn't matter. So- Where did we say it didn't matter in West Fed? I don't have the exact page site, but I believe it'll be around 1,362, your honor. The government argued that because West Fed had already separately agreed to purchase Old Western, it shouldn't be allowed to claim the value of Old Western in reliance. Yet this court affirmed the award of that value. Now, your honor, let me turn to Hansen, because I believe Hansen is also directly on point and dispositive. But in Hansen, the stock was contributed to a new entity, right? What happened in Hansen in terms of the mechanics of the transaction are, as your honor says, because of a provision, and I would direct the court's attention to footnote 15 in the Hansen opinion, where the court explained that New Jersey corporate law, and the Hansens were in New Jersey, required that whenever you have a company receive into it another merged company, you're required to issue new shares. So what happened in Hansen was the Hansens owned the Healthy Thrift Raritan. Because of this New Jersey law, they created a new sub, Hansen Bank. They then contributed their stock in the Healthy Thrift Raritan into the new sub, Hansen Bank. So why isn't that a significant difference? Because, your honor, it makes no legal or economic difference whether there's this interim creation of a new sub. The economic bottom line is the Hansens came in owning a Healthy Thrift, lock, stock, and barrel. And they came out of the transaction owning the result of the merger, their Healthy Thrift, plus the government's insolvent thrift, lock, stock, and barrel. That's exactly the same as this transaction. And the only difference is that you didn't go through this mechanic of creating a new sub. It can't possibly make a difference if the court's asking the question, what did TFC put into the transaction out of its own pocket, put at risk? And your honor asked a question about whether it's important. So your view is that any time the holding company permits the subsidiary to acquire a failed thrift, that the holding company is putting its equity into the transaction. It is putting its equity at risk because it is, if it's in privity with the government and if it's foreseeable. Now, the court decided the Old Stone case recently where the court ultimately held there that the recovery of the value of the thrift was not foreseeable. But that was distinguishable because there, it was the line of causation. Yeah, but I'm not asking about Old Stone. I'm asking, under your theory, any time the holding company is a party of the contract, any time the holding company permits the merger to go forward and the acquisition to occur by the subsidiary, the holding company itself can recover the value of the subsidiary. That was the holding in Westfed, your honor. That was the holding in Hanson. And I would submit it has to be the holding in Hanson. Well, it's not the holding in Hanson because they contributed the stock to a new entity. They didn't just continue to own the same stock. Your honor, I would submit that the difference in the mechanics caused by this New Jersey law did not change the economics one whit. Well, but that's an argument. But it is different in that respect. The mechanics were different. Yes, they were, your honor. What was the obligation of TFC under the assistance agreement? What was the legal obligation of TFC? It was required to provide the government with proof that it had approved the merger. Right. As what? As a stockholder of TransOhio. As the owner of TransOhio, yes, your honor. So how does that give it standing to sue for damages for the subsidiary? It's not suing for damages for the subsidiary, your honor. Just as in WestFed, it's suing for its own damages. What damages did it obtain? The damages that are obtained are two pieces of damages. One, just like WestFed, it put in its thrift, in this case $126 million thrift, and put it at risk. And because of the government's breach, it put it at risk in reliance on the government's regulatory contract promises. And because of the government's breach, it ultimately lost that. The second piece is separate, and that's the $42 million that it put in shortly after the transaction. That was also put in in reliance on the government's promise, and that was also lost when TransOhio was seized. Even though there was evidence of the effect that that amount would have been put in in 1985? Your honor, let me turn to that, because the evidence that the government relies on, and first, I must correct, respectfully, my brother from the government. The government, in its brief on page 36, acknowledged that the trial court had sufficient evidence to support the proposition that the $42 million was put in in reliance on the government's promises. And specifically, the trial court had the testimony of Mr. Burstein on the TFC side, the testimony of the regulator, Mr. Muldoon, both of whom said that TFC would never have put this money in in reliance on the government, absent the government's regulatory contract promise. And indeed, one only need look at the Supreme Court's WinStar decision, because this was a case where, absent the government's regulatory contract, the merged thrift would have been seizable immediately upon the closing of the transaction. So it would have been madness, in the Supreme Court's words, for TransOhio to put this money in. Now, Judge Garza- What about the $107 million put in by Fishley? That was part of their contribution, but it wasn't enough to get the thrift to the point on closing, where it was not subject to seizure. That filled part of the hole, but the transaction as a whole required the $107 million, it required TFC's, TransOhio's capital, and it required the- What capital did TFC put in? By agreeing to the contribution of TransOhio, the equity value of TransOhio was then put behind the merged thrift's citizen and dollar. Well, the citizen and the Cleveland thrift were all merged into TransOhio. Yes, Your Honor, and that effectively put TransOhio's capital behind those previously insolvent thrifts. TransOhio's, not TFC's. TFC, as the owner of- Not TFC's, TransOhio's net worth was put up. The equity value of TransOhio was put behind them, but again, Your Honor, I would just refer to both Hanson and Westfed, where it was exactly the same situation. The owner of the thrift, not the thrift itself, the owner of the thrift was permitted to recover the value of the thrift that it put into the transaction. That was true in Westfed, that was true in Hanson. And Your Honor, I never got to answer your question about the two documents that Mr. Ryan referred to concerning plans to infuse the $42 million earlier. Those documents are in no way inconsistent with the factual proposition that the investment of the $42 million that TFC actually made was in reliance upon the government's promises. When TFC actually put the $42 million in, citizen and dollar were already in the thrift. Once they're in the thrift, the sanity of the investment depends upon the government's regulatory promises. The fact that they were thinking about making other separate investments, including one in TransOhio itself, in no way undermines the trial court's summary judgment ruling that the $42 million was invested in reliance upon the transaction, excuse me, upon the government's regulatory contract promises. Let me turn quickly to causation. I agree with Mr. Ryan on one point. The government's primary argument there is the burden of proof. And the court really, he is correct, need not reach that, but for a different reason. The question is, the underlying question on causation is whether TFC lost its investment because of the government's breach of its contract. Everybody agrees TFC lost everything when TransOhio was seized. So the question is, but for the government's breach of contract, would TransOhio have been seized? The trial court answered that question factually by squarely finding that, but for the breach, TransOhio would not have been seized. I don't understand why seizure is the question. The question is, the seizure took place, the question is, why did it take place? Did it take place because of incompetent management or bad transactions, or did it occur as a result of the breach by the government, right? That is the question, Your Honor. And because the court found that had the government kept its word, it would not have been seized, it necessarily follows that it was seized because of the breach, okay? Simple, but for causation. But for the breach, TransOhio would have been seized. Therefore, the breach is the cause of the seizure, which in turn is the vehicle by which TFC. That's almost like a per se rule, isn't it? I would say, Your Honor, it would be per se when you've got a square finding, and that leads me back to Westfed again, Your Honor. There, this court found that the requirement of causation was completely satisfied based on the trial court's finding in that case that but for the breach, Old Western would not have been seized. Exactly the same finding in that case, and that's on page 1,364 of 407F third, was found to be sufficient in that case. We have in this case on page 70 of the appendix. Apart from the fact that the trial court ended up making the finding that they seek, the court was correct, although again, this court need not reach it, in holding the section 349 of the restatement of contracts in a reliance case puts the burden on the breaching party to prove what would have happened in the but for world if there'd been no breach. Those cases and authorities that relating to 349 all relate to the question of whether a contract, if it had been performed to conclusion, would have been profitable or unprofitable. Here, we're dealing with a situation not to trying to estimate what would have happened after the seizure, after the party stopped performing the contract, but what happened between the time of firea and the time of the seizure. So we're not dealing with the speculation about future performance. We're trying to determine who was responsible for the losses that occurred while the contract was being performed, right? Your Honor is temporally correct, but I would suggest that in the period between the breach and the seizure of the bank, we're still dealing with the difficult problem of a counterfactual world. Because the question we're asking is, if TransOhio had this regulatory capital, would it have been seized? Well, I understand the policy argument, but the authorities that you're relying on are all dealing with the situation in which performance had stopped and there was an effort to predict what would have happened if performance had continued. None of those authorities deals with this situation in which there was a breach, some period of continued performance, and then termination. Your Honor is correct. I scoured the law books trying to find a situation like this where there was this gap between the breach and the close of events, if you will, and in this case, the seizure, and just didn't find a case that directly fit that scenario going either way. But I would still say that section 349 and section 344 of the restatement, which says that the burden on the plaintiff is to show that his reliance interest, which it defines as costs incurred because of its reliance on the contract, not costs incurred because of the breach, but costs incurred because of its reliance on the contract, that's my burden as the plaintiff. Section 349 says, once I've shown that, once I've shown my reliance interest, the burden shifts to the defendant to prove, if he can, that but for the breach, there still would have been losses on this contract. Now I concede, Your Honor, that all of the cases and authorities that uniformly hold that this is the rule all dealt with situations where there wasn't this temporal skipping, but I don't think that changes the underlying principles that apply. And with that, I thank Your Honor for your indulgence. Thank you, Mr. Kirk. Mr. Ryan, you have four and a half minutes left. Thank you, Your Honor. First, with regard to the FDIC's argument, the FDIC says, look at the proposals by TransOhio to acquire citizens in dollar, and that tells you that they're the ones who contributed the $126 million. But in fact, if you look at those proposals, what TransOhio said is, there will be, quote, no direct capital infusion. That's at page A4, quadruple O5 of the appendix. So TransOhio was telling the regulators, we're not making a capital infusion. It wasn't telling the regulators we're contributing $126 million. Further- Well, what about West End? I understand the government's theory about Hanson, but what's the government's theory about West End, which they say is in point? With all due respect, that's not what West End said or held. 407- But you do have the same structure. You've got a holding company that contributes the equity of a thrift, which later is seized. They lost the equity. Absolutely not. That's not the structure. Show me what happened in West End. 407F3rd at 1368. The government insists that the trial court erred in awarding West Fed $148 million, which is the total amount West Fed had spent to acquire the old Western stock. West Fed had out-of-pocket expenses of $148 million in connection with the transaction. Mr. Kirk said, well, the government argued that the transactions weren't connected. TFC owned TransOhio. Why isn't it an out-of-pocket expense? To contribute TransOhio's equity. Because it didn't contribute TransOhio's equity. It did not infuse its stock in TransOhio into the deal, which relates to Hanson, and it didn't go out and spend $148 million as part of the transaction, which is what occurred in West Fed. Mr. Kirk says that in West Fed, the thrift that- Why then is TFC in this deal at all? If they don't give anything and there's no need for them, why did everything hinge on their authorization of TransOhio's contribution to assume the entire value of the deficit? The entire value of the deficit, first, with regard to FISLIC's contribution, was almost wiped out, because there was $107.5 million FISLIC's contribution. But TFC was in the deal to maintain the net worth of TransOhio. That is clear. That's its obligation under section 14 of the contract. That's why shareholders and holding companies are in so many of these cases. They're there to maintain the net worth of the combined thrift. TFC was never called upon to make good on that obligation. It never became necessary to make good on that obligation. With regard to the $42 million, TFC has apparently changed its position now, saying that the $42 million was necessary for the deal to go through. That is simply not the case. And again, I will go back to Mr. Burstein's affidavit, where Mr. Burstein says clearly and directly that the regulatory capital was not intended to support the TransOhio acquisition. This capital infusion, the $42 million, was not intended or designed to support TransOhio's acquisition of citizens in dollar. That's page A4. But it could still be made in reliance on the four appearances that came out of there. It could have, but it wasn't, those aren't the facts that were presented within this case. We're presented with- That's what the court found, wasn't it? On summary judgment, where the parties submitted disputed facts and the court decided on summary judgment. And the facts show that they intended to infuse this money anyways. So let's say, what would have happened if there had been no regulatory capital contract? It's TFC's and TransOhio's position that the entire deal, the entire citizens and dollar transaction would not have gone through without the regulatory capital contract. So that's the but for a world that we're dealing with. And TFC's own documents say, regardless of TransOhio and citizens, we're going to infuse the $42 million. Finally, very quickly with regard to section 349 of the restatement. You only get to section 349 of the restatement, which is entitled or referred to as the losing contract defense, if the plaintiff first proves that the breach caused it lost. Do you agree with Mr. Kirk that there aren't any cases one way or the other on the 349 point in this context? Yes, there are, because all the cases dealing with 349 address a losing contract defense. That is, upon full performance of the contract, would the contract itself have caused a loss? We have never claimed that the contract, the goodwill contract would have caused the losses. What we've claimed is that these other factors having nothing to do with the breach and having nothing to do with the contract itself caused the losses, the bad economy, the bad loans. Those would have decreased TransOhio's regulatory capital, regardless of the breach. And it was plaintiff's burden to show that it was the breach and not these other factors. Suppose here that there weren't any claim for the equity of the subsidiary. Would this whole burden of proof question be still pertinent to the $42 million? Yes, TFC would have to show that the, with regard to the $42 million, if we assume contrary to what we believe are the facts, that that was infused in reliance on the contract, plaintiff would still have to show that the breach itself caused it some loss with respect to that $42 million. And it never even attempted to do that. And the trial court just said that they were entitled to $42 million automatically upon the breach. And that is in conflict with at least five cases from this court, which say that the plaintiff must show that the breach caused the reliance damages. Thank you, Mr. Ryan. Thank you.